IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| J. DOE 1-5, *on behalf of themselves and all others similarly situated,* <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Case No: 25-947 C <br><br> Judge: |

**PLAINTIFFS' MOTION FOR LEAVE TO PROCEED
UNDER PSEUDONYMS AND FOR A PROTECTIVE ORDER**

Pursuant to Rule 10(a) of the Rules of the United States Court of Federal Claims (RCFC), plaintiffs J. Doe 1-5 respectfully request that the Court grant this motion for leave to proceed under pseudonyms and a related protective order. In their complaint, plaintiffs seek damages from the United States Agency for International Development (USAID) for its breaches of plaintiffs' contracts under the Donald M. Payne Fellowship Program. USAID's breaches occurred in connection with the government's dismantling of USAID, during which President Donald Trump, Elon Musk, and other administration officials engaged in vitriolic public criticisms of USAID and its personnel. These criticisms have been broadcast to millions of Americans via media reports and Musk's social media empire. If forced to disclose their identities in connection with this litigation, plaintiffs reasonably fear harassment, threats to their physical safety, irreparable damage to their reputations, and retaliation from the government. The Court should grant this motion because the release of plaintiffs' names would expose them to a significant risk of harm and proceeding anonymously will not prejudice the government. In addition, the Court should issue an order adopting the proposed protective order attached to this motion as exhibit 1.

**STATEMENT OF FACTS**

I.   **Plaintiffs' Payne Fellowship contracts**

This case concerns the Donald M. Payne Fellowship Program, which is a highly selective recruiting tool that USAID uses to induce elite college graduates from diverse ethnic and socioeconomic backgrounds into becoming USAID Foreign Service Officers. *See* ECF 1, Compl. ¶ 1 (citing 22 U.S.C. § 2736d). USAID awarded Payne Fellowships to plaintiffs in 2023 and 2024. *Id.* at ¶ 2. Although plaintiffs could have pursued more lucrative degrees and employment opportunities, they accepted their Payne Fellowships because of their dedication to public service and reliance on USAID to honor its obligations under their Fellowships. *Id.* at ¶ 3.

Upon their selection as Payne Fellows, USAID and plaintiffs entered into contracts under which USAID agreed to pay plaintiffs $104,000 to offset their costs for obtaining graduate degrees in international development (or a similar degree) and completing two USAID-mandated summer internships. *Id.* at ¶ 4. In exchange for these payments, USAID required plaintiffs to forego more lucrative degrees and professional opportunities by serving for at least five years as USAID Foreign Service Officers after completing their graduate degrees and internships. *Id.* at ¶ 5.

As relevant here, USAID could only terminate plaintiffs' contracts if they failed to comply with certain contractual obligations such as maintaining at least a 3.2 grade-point average (GPA), receiving a worldwide medical clearance, and obtaining a top-secret clearance. *Id.* at ¶ 6. Plaintiffs met all of their contractual obligations, including those related to GPA, medical clearances, and security clearances. *Id.* at ¶ 7. USAID was therefore contractually required to provide plaintiffs with their Payne Fellowship payments and employment as Foreign Service Officers. *Id.* at ¶ 8.

II.  **USAID's unlawful termination of plaintiffs' Payne Fellowship contracts**

Nevertheless, on February 26, 2025, USAID breached plaintiffs' contracts by terminating

them for non-contractual reasons related to the Trump administration's dismantling of USAID. *Id.* at ¶ 9. USAID then abandoned plaintiffs by refusing to communicate with them about the logistical and financial impacts of the terminations, which include issues related to overdue tuition, suddenly necessary student loans, uncertain overseas internships, cancelled relocations, and unanticipated unemployment. *Id.* at ¶ 10. Making matters worse, plaintiffs' ability to find new jobs has been harmed by their association with USAID because of the Trump administration's unsupported claims that USAID is a radical, evil, criminal, and lunatic-led organization that should die. *Id.* at ¶ 12.[1] USAID's unlawful termination of plaintiffs' contracts has caused them to suffer damages that include (a) unpaid tuition, stipends, and other payments, (b) lost wages and other benefits that plaintiffs would have received but for USAID's breach of their contracts, and (c) compensation for the economic opportunities that plaintiffs surrendered by financing and obtaining international development degrees and completing mandatory internships instead of pursuing more lucrative opportunities. *Id.* at ¶ 13.

**III.    The Trump administration's attacks on USAID and its personnel**

On February 19, 2025, during the term of plaintiffs' contracts, President Trump announced that "over the past month, we have effectively eliminated the U.S. Agency for International Development." See *Does 1-26*, 2025 WL 840574, at *13. The President's announcement followed a series of actions that began on January 20, 2025, and included the following: an executive order establishing the Department of Government Efficiency (DOGE); an executive order pausing new USAID obligations and disbursements; access by DOGE agents to U.S. Department of Treasury

---

[1] *See, e.g., Does 1-26 v. Musk et al.*, No. CV 25-0462-TDC, 2025 WL 840574, at *5 (D. Md. Mar. 18, 2025) (describing the government's attacks on USAID); Axios, "Trump says USAID run by 'lunatics' as Dems demand answers on DOGE visit," Feb. 2, 2025, *available at* https://tinyurl.com/2y8f5wsn.

3

payment systems to freeze USAID disbursements; DOGE members deploying to USAID headquarters to gain access to the agency's financial and personnel systems; the placement of senior USAID officials on administrative leave; DOGE access to all USAID email accounts; removal of USAID's official seal; the shutdown of USAID's website; DOGE access to USAID's data security and sensitive compartmentalized information facilities; the dismantling of all classified USAID computer systems; the deactivation of USAID email accounts; the resignation of USAID's Chief of Staff; the termination of 800 personal service contractors; the closure of USAID headquarters; the announcement that the former USAID headquarters was now occupied by United States Customs and Border Protection; the placement of almost all USAID direct hire personnel on administrative leave, and the implementation of a reduction in force affecting thousands of USAID personnel. *Id* at *2-14.

During this same time period, President Trump and Elon Musk made a series of vitriolic public comments criticizing USAID, its activities, its leadership, and its personnel. President Trump identified Elon Musk as the leader of DOGE, and he stated that DOGE was acting at his insistence and that Musk "answers to" him. *Id* at *3-5. Their vitriolic public criticisms of USAID, magnified by Musk's social media empire, have reached millions of people, many of whom are passionate followers of President Trump and his political agenda.

In a series of February 2, 2025, posts on X, Musk called USAID "evil" and "a criminal organization." *Id* at *10 (internal citations omitted). Later that day, President Trump told reporters that USAID has "been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision." *Id*. During a February 3, 2025, live broadcast on X, Musk said he checked with President Trump "a few times," went over USAID "in detail," and that "he agreed that we should shut it down." *Id*. Musk further claimed that USAID was "incredibly politically partisan"

because it allegedly supports "radically left causes throughout the world including things that are anti-American." *Id.* According to Musk, "as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms." *Id.*

## ARGUMENT

### I. Standard of review

RCFC 10(a) generally requires the identification of plaintiffs. Nevertheless, the Court can seal a plaintiff's identity from disclosure if the public's right of access is outweighed by competing interests. *Black v. United States*, 24 Cl. Ct. 461, 464 (1991). The Court has therefore allowed plaintiffs to proceed anonymously "'when special circumstances justify secrecy,' such as when necessary 'to protect a person from harassment, injury, ridicule or personal embarrassment.'" *Doe No. 1 v. United States*, 143 Fed. Cl. 238, 240 (2019) (quoting *Does I-XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000)). "In such cases, 'the plaintiff's interest in anonymity must be balanced against both the public interest in disclosure and any prejudice to the defendant.'" *Id.* (quoting *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008)). This Court has considered the following five-factor test from *Advanced Textile* to decide whether a plaintiff may proceed anonymously: (1) the severity of the threatened harm to the party; (2) the reasonableness of the party's fears; (3) the party's vulnerability to potential harm; (4) the public interest; and (5) any prejudice to the opposing party at each stage of the proceedings. *Id.* (citing cases).

### II. The Court should grant plaintiffs' motion to proceed under pseudonyms

The five-factor test from *Advanced Textile* demonstrates that the Court should grant plaintiffs' motion to proceed under pseudonyms. First, plaintiffs face a threat of severe physical or psychological harm if their identities are revealed. Second, plaintiffs' fear of harm is reasonable. Third, plaintiffs are vulnerable to potential harm. Fourth, the public interest supports allowing

5

plaintiffs to proceed anonymously. Fifth, allowing plaintiffs to use pseudonyms will not prejudice the government. The Court should therefore grant plaintiffs' motion.[2]

### A. Plaintiffs face a threat of severe harm

"In assessing the weight of a plaintiff's privacy interest in proceeding anonymously, courts generally conclude that a threat of physical or psychological harm is sufficiently severe." *Doe No. 1*, 143 Fed. Cl. at 240-41 (citation omitted). Here, the public disclosure of plaintiffs' identities will expose them to a substantial risk of physical or psychological harm. As explained above, President Trump, Elon Musk, and other administration officials have repeatedly maligned USAID through official government acts and related public statements. Given the administration's documented attacks on universities, corporations, law firms, and other individuals and entities who oppose its actions, plaintiffs face a clear and present risk of severe harm.

For example, the government possesses virtually *all* of plaintiffs' critically sensitive personal information by virtue of its control over USAID's files and digital infrastructure. This personal information includes social security numbers, addresses, health records, financial data, school transcripts, and—most importantly—the treasure trove of personal data that the government collected from plaintiffs as part of the Standard Form 86 security clearance process. Plaintiffs face a substantial risk of physical or psychological harm if this information is used for improper purposes or is otherwise improperly disclosed to the public.

By way of example, Chief Justice John Roberts recently described the threats to the judiciary when vitriolic criticism by public figures is magnified via social media:

> Today, in the computer era, intimidation can take different forms . . . . Occasionally, court critics deploy "doxing"—the practice of releasing otherwise private information such as addresses and phone numbers—which can lead

---

[2] *See Does 1-26 v. Musk et al.*, No. CV 25-0462-TDC, ECF 24 (granting motion to proceed anonymously to USAID plaintiffs under similar circumstances).

> to a flood of angry, profane phone calls to the judge's office or home. Doxing also can prompt visits to the judge's home, whether by a group of protestors or, worse, an unstable individual carrying a cache of weapons. Both types of activity have occurred in recent years in the vicinity of the Nation's capital. Activist groups intent on harassing judges have gone so far as to offer financial incentives for posting the location of certain judicial officers.
>
> \*\*\*
>
> Public officials certainly have a right to criticize the work of the judiciary, but they should be mindful that intemperance in their statements when it comes to judges may prompt dangerous reactions by others.
>
> \*\*\*
>
> To make matters worse, as I noted in my 2019 Year End Report, the modern disinformation problem is magnified by social media, which provides a ready channel to "instantly spread rumor and false information."[3]

To be sure, the Chief Justice was focused on threats to the judiciary. But plaintiffs—recent college graduates at the beginning of their careers—face similar threats without the protections afforded to federal judges. The government's vitriolic public criticism of USAID, combined with its access to plaintiffs' sensitive personal information, threatens plaintiffs with substantial harm, including doxxing, harassment, retaliation, reputational damage, and physical harm.

### B. Plaintiffs' fear of harm is reasonable

Plaintiffs have a reasonable fear that they will suffer harm if publicly associated with this lawsuit. This fear is neither "speculative" nor "unsubstantiated." *See Doe No. I*, 143 Fed. Cl. at 241 (quoting *Doe v. Pub. Citizen*, 749 F.3d 246, 274 (4th Cir. 2014)). Instead, plaintiffs "believe that the risk of harm could materialize." *Id*. (citing *Advanced Textile*, 214 F.3d at 1071). This fear is reasonable because, as the Chief Justice explained in his Year-End Report, our current political environment—amplified by social media—can encourage efforts to bring psychological or physical harm upon perceived enemies of the Trump Administration. At this time and in this environment, plaintiffs reasonably fear harm if their identities are disclosed.

---

[3] *Chief Justice John Roberts, 2024 Year-End Report on the Federal Judiciary*, https://www.supremecourt.gov/publicinfo/year-end/2024year-endreport.pdf.

### C. Plaintiffs are vulnerable to potential harm

Plaintiffs are vulnerable to harm if the Court requires them to disclose their identities. This potential harm includes harassment, assaults, retaliation, doxxing, embarrassment, and damage to their reputations. For example, plaintiffs are justifiably concerned that they will be unable to obtain federal or private-sector jobs if their identities are exposed. As recent college graduates who are now unexpectedly unemployed, plaintiffs also lack resources to obtain and maintain security measures to safeguard against physical and online attacks. Similarly, plaintiffs may be unable to obtain affordable counseling to mitigate against psychological harms associated with threats and harassment. Moreover, there is an extreme disparity of power at issue here: the Trump administration and its supporters against unemployed young adults.

### D. The public interest supports allowing plaintiffs to proceed anonymously

Although the public has a general interest in a plaintiff's identify, "the public interest in knowing a plaintiff's name is weaker where anonymity does not obstruct the public's view of the issues." *Doe No. I v. United States*, 143 Fed. Cl. 238, 240 (2019) (citing *Does I-XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068-69 (9th Cir. 2000)). Here, anonymity does not obstruct the public's view of the relevant issues because those issues are set forth in the complaint. For example, a member of the public reading the complaint will know the composition of the putative class, as well as the facts and legal theories that support plaintiffs' breach of contract claims against USAID. Plaintiffs' anonymity does not obstruct the public's view of the issues.

### E. Allowing plaintiffs to use pseudonyms will not prejudice the government

Finally, the government will not be prejudiced if the Court allows plaintiffs to proceed anonymously. In assessing prejudice, this Court considers a number of factors, including the following: whether a jury would view an anonymous plaintiff differently; whether anonymity would

deprive the defendant of potential witnesses; whether the defendant knows the plaintiff's identity; and whether anonymity would impact discovery. *See Doe No, 1*, 143 Fed. Cl. at 241 (citing cases). Here, there are no jury concerns because this case will be decided by a bench trial. Anonymity will not deprive the government of witnesses or discovery. And the government knows plaintiffs' identities. See *Boggs v. United States*, 143 Fed. Cl. 508, 512 (2019) (finding no prejudice where the government knew plaintiffs' identities); *see also Roe v. Aware Woman Ctr. for Choice*, 253 F.3d 678, 687 (11th Cir. 2001); *Candidate No. 452207 v. CFA Inst.*, 42 F. Supp. 3d 804, 810 (E.D. Va. 2012). The government will not be prejudiced by plaintiffs using pseudonyms.

## CONCLUSION

For these reasons, plaintiffs respectfully request that the Court grant this motion for leave to proceed under pseudonyms and adopt the proposed protective order attached as exhibit 1.

Respectfully submitted,

*/s/Joshua D. Schnell*
Joshua D. Schnell*
Samuel Van Kopp
CORDATIS LLP
1011 Arlington Blvd
Suite 375
Arlington, VA 22209
(202) 342-2550
jschnell@cordatislaw.com
svankopp@cordatislaw.com

Damien D. Brewster**
LEWIS & MCINTOSH, LLC
372 N. Lewis Road
Royersford, PA 19568
(484) 932-8900
damien@lmtlegal.com

* Counsel of Record
** Application for admission forthcoming

Dated:  June 5, 2025                                      *Counsel for Plaintiffs*

# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| J. DOE 1-5, *on behalf of themselves and all others similarly situated,*<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>THE UNITED STATES,<br><br>　　　　Defendant. | Case No:<br><br>Judge: |

**[PROPOSED] PROTECTIVE ORDER**

　　All pleadings and other documents that identify plaintiffs and/or putative class members by name are protected from public disclosure and shall be filed under seal. The following conditions apply to this Protective Order.

1. <u>Protected Information Defined.</u> "Protected information" as used in this order means the information that must be protected to safeguard the anonymity of plaintiffs and putative class members, including information contained in the following:
    (a)　any document (e.g., a pleading, motion, brief, notice, or discovery request or response) produced, filed, or served by a party to this litigation; or
    (b)　any deposition, sealed testimony or argument, declaration, or affidavit taken or provided during this litigation.

2. <u>Restrictions on the Use of Protected Information.</u> Protected information may be used solely for the purposes of this litigation and may not be given, shown, made available, discussed, or otherwise conveyed in any form except as provided herein or as otherwise required by federal statutory law.

3. <u>Individuals Permitted Access to Protected Information.</u> Except as provided in paragraphs 7 below, the only individuals who may be given access to protected information are the parties, counsel for a party, and independent consultants and experts assisting such counsel in connection with this litigation.

4. <u>Applying for Access to Protected Information.</u> An individual seeking access to protected information pursuant to Appendix C, Section VI of this court's rules must read this Protective Order; must complete the appropriate application form (Form 9—"Application for Access to Information Under Protective Order by Outside or Inside Counsel," or Form 10—"Application for Access to Information Under Protective Order by Expert Consultant or Witness"); and must file the executed application with the court.

5. <u>Objecting to an Application for Admission.</u> Any objection to an application for access must be filed with the court within two (2) business days of the objecting party's receipt of the application.

6. <u>Receiving Access to Protected Information.</u> If no objections have been filed by the close of the second business day after the other parties have received the application, the applicant will be granted access to protected information without further action by the court. If any party files an objection to an application, access will only be granted by court order.

7. <u>Access to Protected Information by Support Personnel.</u> Paralegal, clerical, and administrative support personnel assisting any counsel who has been admitted under this Protective Order may be given access to protected information by such counsel if those personnel have first been informed by counsel of the obligations imposed by this Protective Order.

8. <u>Identifying Protected Information.</u> Protected information may be provided only to the court and to individuals admitted under this Protective Order and must be identified as follows:
    (a) if provided in electronic form, the subject line of the electronic transmission shall read **"CONTAINS PROTECTED INFORMATION"**; or
    (b) if provided in paper form, the document must be sealed in a parcel containing the legend **"PROTECTED INFORMATION ENCLOSED"** conspicuously marked on the outside.

The first page of each document containing protected information, including courtesy copies for use by the judge, must contain a banner stating **"Protected Information to Be Disclosed Only in Accordance With the U.S. Court of Federal Claims Protective Order"** and the portions of any document containing protected information must be clearly identified.

9. <u>Filing Protected Information.</u> Pursuant to this order, a document containing protected information may be filed electronically under the court's electronic case filing system using the appropriate activity listed in the **"SEALED"** documents menu. If filed in paper form, a document containing protected information must be sealed in the manner prescribed in paragraph 9(b) and must include as an attachment to the front of the parcel a copy of the certificate of service identifying the document being filed.

10. <u>Protecting Documents Not Previously Sealed.</u> If a party determines that a previously produced or filed document contains protected information, the party may give notice in writing to the court and the other parties that the document is to be treated as protected, and thereafter the designated document must be treated in accordance with this Protective Order.

11. <u>Redacting Protected Documents For the Public Record.</u>
    (a) <u>Initial Redactions</u>. After filing a document containing protected information in accordance with paragraph 10, or after later sealing a document pursuant

2

    to paragraph 11, a party must promptly serve on the other parties a proposed redacted version marked **"Proposed Redacted Version"** in the upper right-hand corner of the first page with the claimed protected information deleted.

  (b) <u>Additional Redactions</u>. If a party seeks to include additional redactions, it must advise the filing party of its proposed redactions within two (2) business days after receipt of the proposed redacted version, or such other time as agreed upon by the parties. The filing party must then provide the other parties with a second redacted version of the document clearly marked **"Agreed-Upon Redacted Version"** in the upper right-hand corner of the page with the additional information deleted.

  (c) <u>Final Version</u>. At the expiration of the period noted in (b) above, or after an agreement between the parties has been reached regarding additional redactions, the filing party must file with the court the final redacted version of the document clearly marked **"Redacted Version"** in the upper right-hand corner of the first page. This document will be available to the public.

  (d) <u>Objecting to Redactions</u>. Any party at any time may object to another party's designation of certain information as protected. If the parties are unable to reach an agreement regarding redactions, the objecting party may submit the matter to the court for resolution. Until the court resolves the matter, the disputed information must be treated as protected.

12. <u>Waiving Protection of Information.</u> A party may at any time waive the protection of this order with respect to any information it has designated as protected by advising the court and the other parties in writing and identifying with specificity the information to which this Protective Order will no longer apply.

13. <u>Safeguarding Protected Information.</u> Any individual admitted under this Protective Order must take all necessary precautions to prevent disclosure of protected information, including but not limited to physically securing, safeguarding, and restricting access to the protected information.

14. <u>Breach of the Protective Order.</u> If a party discovers any breach of any provision of this Protective Order, the party must promptly report the breach to the other parties and immediately take appropriate action to cure the violation and retrieve any protected information that may have been disclosed to individuals not admitted under this Protective Order. The parties must reasonably cooperate in determining the reasons for any such breach.

15. <u>Seeking Relief From the Protective Order.</u> Nothing contained in this order shall preclude a party from seeking relief from this Protective Order through the filing of an appropriate motion with the court setting forth the basis for the relief sought.

16. <u>Maintaining Filed Documents Under Seal.</u> The court will maintain properly marked protected documents under seal throughout this litigation.

17. <u>Disposing of Protected Information.</u> Within thirty (30) days after the conclusion of this action (including any appeals and remands), each party must destroy all protected information received pursuant to this litigation and certify in writing to each other party that

such destruction has occurred or must return the protected information to the parties from which the information was received. With respect to electronically stored information (ESI) stored on counsel's computer network(s), destruction of ESI for purposes of compliance with this paragraph shall be complete when counsel take reasonable steps to delete all such ESI from the active email system (such as, but not limited to, the "Inbox," "Sent Items," and "Deleted Items" folders) of admitted counsel and of any personnel who received or sent emails with protected information while working under the direction and supervision of such counsel, and by deleting any protected ESI from databases under counsel's control. Compliance with this paragraph does not require counsel to search for and remove ESI from any computer network back-up tapes, disaster recovery systems, or archival systems. Each party may retain one copy of such documents, except when the retention of additional copies is required by federal law or regulation, provided those documents are properly marked and secured.

IT IS SO ORDERED.

_____

Judge